| | |
|---|---|
| **STATE OF MAINE** | **SUPERIOR COURT** |
| **WASHINGTON COUNTY, ss** | **CIVIL ACTION** |
| | **DOCKET NO. CV-20-** 03 |

| | |
|---|---|
| **DONNA WEBB** | ) |
| | ) **PLAINTIFF'S COMPLAINT** |
| **Plaintiff,** | ) **FOR FRAUD, NEGLIGENT INFLICTION** |
| | ) **OF EMOTIONAL DISTRESS AND** |
| **v.** | ) **INTENTIONAL INFLICTION OF EMOTIONAL** |
| | ) **DISTRESS.** |
| **CALAIS REGIONAL HOSPITAL** | ) |
| | ) |
| **Defendant.** | ) |

NOW COMES, Plaintiff Donna Webb ("Webb" or "Plaintiff"), by and through her attorney of record, the Law Firm of Guy D. Loranger, and complains against Defendant Calais Regional Hospital ("Defendant" or "CRH"") as follows:

## PARTIES

1. Plaintiff resides in Calais, Maine.

2. Defendant operates a hospital in Calais, Maine.

3. The claims arise out of incidents which took place in Washington County, State of Maine.

## FACTUAL ALLEGATIONS

4. Webb was employed as a nurse at CRH in the Obstetrics Unit ("OB").

5. The OB unit was not rated to admit high-risk pregnancy cases. Accordingly, CRH transferred high-risk pregnancies to hospitals qualified to handle such cases.

6. The OB unit employed only a core of four certified OB nurses to cover all shifts. The minimal OB staff allowed for only one OB nurse per shift and caused nurse managers to expect and persuade OB nurses to come in at short notice and even if unwell.

1

7. CRH's minimal staffing created potential risks. The minimal staff caused nurse mangers to pressure OB nurses to cover their shift even if sick. This practice violated CRH policy and accepted nursing practices. A lone OB nurse on duty also presented risk when a problem pregnancy arose and required a second nurse for assistance. A lone OB nurse on duty created further risk if the Unit had admitted two patients.

8. To address the understaffing risks, Webb and the other OB nurses advocated for CRH to staff two registered OB nurses on each shift or to be on call should the need arise. CRH rejected the requests due to alleged budget constraints. In other words, CRH placed money over patient safety.

9. The fears of Webb and her peers came to light in August of 2013. On the subject day, CRH admitted two pregnant patients, yet only Webb was on duty. During the shift, Webb had to spend more time with the patient in active labor, leaving her unable to constantly interpret the fetal heart monitor of the other patient resulting in some mistakes in interpretation of the fetal heart monitor.

10. Webb reported the events to CRH, recounting her need to place priority on the patient in active labor, resulting in an unsafe condition for both patients. The incident clearly illustrated the need for CRH to staff a second qualified OB nurse. In response, CRH ignored Webb's warning, but, instead, issued a retaliatory written warning to Webb.

11. On September 27, 2014, the fears of Webb and her co-workers tragically became prophetic with the death of an unborn fetus due to the risks created by CRH's negligence and understaffing. The negligence commenced with CRH admitting a high-risk pregnancy instead of transferring the mother and fetus to a qualified hospital. CRH's negligence continued with CRH pressuring Webb to come in despite Webb's request to call out due to illness. CRH's

2

negligence continued with Webb serving as the only OB nurse on duty to care for the high-risk patient. CRH's negligence culminated with CRH having insufficient staff to safely perform an emergency C-Section in a desperate attempt to save the fetus. CRH's combined negligence resulted in the unnecessary death of the fetus.

12. After the death of the fetus, CHR's legal counsel and risk management commenced an investigation and met with Webb. In the meeting, Webb reported the understaffing in OB, the need to transfer the patient to hospital qualified to handle the high-risk patient, that CRH did not have a neo-natal ICU, and anesthesia available 24 hours a day, and CRH experienced weekends where Webb had problems getting a radiology technologist to do a bio-physical profile. Webb also reported her illness, yet being pressured to come into work, and the lack of qualified supervisor on duty. Finally, Webb reported the delay with the cesarean section, and the pain endured by the patient during the cesarean section.

13. On October 9, 2014, Webb was scheduled to return for her initial shift since the stillbirth. The day before her shift, Webb called her supervisor Erica Marshall ("Marshall") to confirm her shift. In response, Marshall told Webb not to come because CRH had placed Webb on administrative leave until a chart review by an independent person was complete. Marshall said the chart review should be completed within a couple of weeks.

14. During Webb's discussion with Marshall, Marshall documented CRH's notice of Webb's emotional distress arising from the incident, writing that Webb "would be consulting with her counselor because she was so guilt ridden." Marshal acknowledged Webb's grief and recommended that she contact human resources for assistance or support.

15. On October 29, 2014, Webb's union requested an update on the investigation and Webb's employment status. In response, CRH assured the union that "investigation is expected to be complete in a few more weeks."

16. By early November of 2014, CRH received the independent chart review; CRH, however, did not reinstate Webb. Instead, on November 3, 2014, CRH notified the BON that it had suspended Webb. In the letter, CRH alleged that Webb violated applicable standards of nursing care.

17. On November 4, 2014, CRH notified Webb of its notice to the BON and her suspension. In the call, Webb asked if she would be fired. In response, CRH told Webb that an investigation was underway and, therefore, it could not answer her question at that time.

18. On December 2, 2014, Webb's union again requested an update on the investigation and Webb's employment status. In response, CRH again claimed that "the investigation is continuing and may be another month."

19. On December 11, 2014, CRH responded to the BON's request for further information. In the submission, CRH represented that,

> Webb was placed on administrative leave pending the results of a complete investigation of this incident. A formal, final decision as to her position at the Hospital will be made and conveyed to her then.

20. In December of 2014, CRH made the decision to terminate Webb. CRH, however, did not disclose the decision to Webb, her union or the BON.

21. CRH, however, for over two and a half years did not disclose to Webb, her union or the BON its decision to terminate Webb. CRH, instead, as set forth infra, fraudulently concealed the subject decision by continually misrepresenting to Webb, her union and the BON that no decision had been made regarding Webb's employment status.

22. On February 10, 2015, Webb's union again contacted CHR regarding the investigation and Webb's employment status. The union also advised CRH that "the unusual length of this suspension and investigation is a hardship on Donna..." In response, CRH intentionally misrepresented that it had not decided on Webb's employment status.

23. On March 26, 2015, CRH and David Herzer ("Herzer"), the attorney for CHR's insurance carrier discussed disclosing the decision to terminate Webb. Herzer and CRH agreed to not disclose the decision to terminate Webb because CRH's insurance company feared the termination would be viewed as an admission in a wrongful death suit brought by the family of the deceased fetus.

24. On July 15, 2015, CRH and Herzer again agreed to not disclose its decision to terminate Webb until the resolution of the impending wrongful death case.

25. On November 20, 2015, CRH received a notice of claim for a wrongful death lawsuit. In response, CRH and Herzer again agreed to not disclose the decision to terminate Webb.

26. As Webb's administrative leave continued, she suffered emotionally over her uncertain employment status, the death of the fetus, her inability to obtain other employment and to just move on with her life.

27. On June 9, 2016, the BON met to address the complaint against Webb. The BON expressed its disgust at the "thin edge of the law" which CRH was "skating on" with its staffing practice in OB unit. The BON ultimately concluded the circumstances created "the perfect storm" of "unfortunate circumstances" which led to the death of the fetus. The BON, however, commended Webb for her loyalty to CRH and for the care to her patients. The BON also noted that, unfortunately, it is not unusual for nurses, due to understaffing, to go to work despite not feeling well.

5

28. The following week, the BON issued its finding, writing

> Pursuant to a meeting with the Board on June 9, 2016, the Board reviewed your response to the information submitted by Calais Regional Hospital. This will confirm that the Board voted to take no further action on the provided report from Calais Regional Hospital however, in accordance with an MSRA 8003 (5)(E) The Board voted to issue the following letter of concern. Pursuant to that statute, this letter of concern is not a formal proceeding and does not constitute any adverse or disciplinary action of any form.

29. Shortly after the BON exonerated Webb, CRH finally disclosed its decision to terminate Webb. Webb also learned CRH would terminate her if she did not resign. Accordingly. Webb resigned.

30. On May 23, 2017, CRH announced the closure of the OB unit due to "heavy financial losses experienced by the unit."

31. Webb subsequently filed a complaint with the Maine Human Rights Commission regarding her termination. In response to the complaint, CRH did not disclose of its decision in December of 2014 to terminate Webb.

32. In January of 2018, Webb filed a lawsuit alleging a violation of the Maine Whistleblowers Protection Act ("WPA") arising out of her termination.  The Scheduling Order in the lawsuit set a deadline of June 18, 2018 to amend the pleadings.

33. After the expiration of the deadline to amend the pleading and the discovery deadline, CRH produced documents which indicated CRH made the decision to terminate Webb well before 2017.

34. To attempt to address the issue of when CRH made the decision to terminate Webb, on November 21, 2018, Webb took a 30(b)(6) deposition of CRH's representative. The subject matter of the deposition included CRH's decision to terminate Webb. In the deposition, the 30(b)(6) witness testified that CRH made the decision to terminate Webb between December

2014 and February 2015. The 30(b)(6) witness, however, could not pinpoint the exact date. Plaintiff's counsel, therefore, asked CRH's counsel if he knew the date. In response, CRH's counsel contradicted the witness, stating that CRH had not decided to terminate Webb at that time, asserting "There's no hard date. This is just what we were going to do. There was no decision point."

35. CSR subsequently filed a motion for summary judgment in the initial lawsuit. In the subject motion, CRH finally admitted that it made the decision to terminate Webb in December of 2014. Specifically, in the motion, Herzer admitted in an affidavit that on March 26, 2015, he met with CRH's representatives "to discuss the termination of Ms. Webb's employment." Herzer then declared that,

> At the meeting, we discussed that Chief Nursing Officer Cheryl Zwingman-Bagley decided to terminate Ms. Webb back in December of 2014.

36. Herzer's admission established that CHR for two and a half years had fraudulently concealed its decision to terminate Webb, thus leaving Webb in limbo during this entire time and causing her to experience extreme emotional distress as a result of the unconscionable fraud.

## COUNT I: FRAUD

37. Plaintiff incorporates by reference the allegations in the above paragraphs.

38. CRH represented to Webb from December 2014 until July of 2017 that it had not decided to terminate her.

39. CRH made the subject representation with knowledge of its falsity.

40. CRH made the false representations to induce Webb to not take actions as it would make CRH look bad.

41. Webb justifiably relied on CRH's false representations.

42. CHR's actions amount to malice.

43. As a result of CRH's fraud, Webb has suffered the damages set forth below.

## COUNT II: FRAUDULENT CONCEALMENT

44. Plaintiff incorporates by reference the allegations in the above paragraphs.

45. From December 2014 until July of 2017, CRH intentionally did not disclose to Webb that it had decided to terminate Webb.

46. CRH intentionally did not make the subject disclosure to Webb to refrain her from taking actions that would make CRH look bad.

47. Webb justifiably relied on CRH failure to disclose and thus took no actions in response to the non-disclosure.

48. CHR's actions amount to malice.

49. Plaintiff has suffered the damages set forth below.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

50. Plaintiff incorporates by reference the allegations in the above paragraphs.

51. CRH negligently did not disclose to Webb from December 2014 until July of 2017 that it had decided to terminate Webb.

52. CHR had notice that its refusal to disclose Webb's employment status was causing her emotional distress.

53. Webb suffered serious emotional distress as a result of CHR's negligence.

54. Plaintiff has suffered the damages set forth below as a result of CHR's negligence.

55. Plaintiff has suffered the damages set forth below.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

56. Plaintiff incorporates by reference the allegations in the above paragraphs.

57. CRH engaged in intentional or reckless conduct by fraudulently concealing its decision to terminate for two and a half years.

58. CRH's intentional and reckless conduct inflicted serious emotional distress to Webb.

59. CRH's behavior was so extreme or outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable.

60. Webb suffered serious emotional distress as a result of CHR's conduct.

61. Plaintiff has suffered the damages set forth below as a result of CHR's conduct.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court (1) enter judgment in favor of the Plaintiff and (2) award damages sufficiently large to compensate for damages she has suffered as a result of Defendant's conduct including, but not limited to, damages for general and non-economic damages, punitive damages, economic damages, pre-judgment and post- judgment interest, lost wages, injunctive relief, costs of this suit, including reasonable attorney fees and costs, and such further relief the Court may deem proper.

Dated:  January 22, 2020

Guy D. Loranger, Esq., Bar No. 9294
Attorney for Plaintiff

Law Office of Guy D. Loranger
1 Granny Smith Court, Suite 3
Old Orchard Beach, Maine 04064
(207) 937-3257
guy@lorangerlaw.com

# SUMMARY SHEET
## M.R. Civ. P. 5(h)

This summary sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by the Maine Rules of Court or by law.  This form is required for the use of the Clerk of Court for the purpose of initiating or updating the civil docket.  (SEE ATTACHED INSTRUCTIONS)

---

**I. County of Filing or District Court Jurisdiction:**  Washington

---

**II. CAUSE OF ACTION**   (Cite the primary civil statutes under which you are filing, if any.)

Fraud, Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress

---

**III.**     **NATURE OF FILING**

☑ Initial Complaint

☐ Third-Party Complaint

☐ Cross-Claim or Counterclaim

☐ **If Reinstated or Reopened case, give original Docket Number** _____ CV-2020-03

(If filing a second or subsequent Money Judgment Disclosure, give docket number of first disclosure)

---

**IV.**     ☐ **TITLE TO REAL ESTATE IS INVOLVED**

---

**V.**     **MOST DEFINITIVE NATURE OF ACTION.**  (Place an X in one box only)     Check the box that most closely describes your case.

### GENERAL CIVIL (CV)

**Personal Injury Tort**
- ☐ Property Negligence
- ☐ Auto Negligence
- ☐ Medical Malpractice
- ☐ Product Liability
- ☐ Assault/Battery
- ☐ Domestic Torts
- ☐ Other Negligence
- ☐ Other Personal Injury Tort

**Non-Personal Injury Tort**
- ☐ Libel/Defamation
- ☐ Auto Negligence
- ☐ Other Negligence
- ☐ Other Non-Personal Injury Tort

**Contract**
- ☐ Contract

**Declaratory/Equitable Relief**
- ☐ General Injunctive Relief
- ☐ Declaratory Judgment
- ☐ Other Equitable Relief

**Constitutional/Civil Rights**
- ☑ Constitutional/Civil Rights

**Statutory Actions**
- ☐ Unfair Trade Practices
- ☐ Freedom of Access
- ☐ Other Statutory Actions

**Miscellaneous Civil**
- ☐ Drug Forfeitures

- ☐ Other Forfeitures/Property Libels
- ☐ Land Use Enforcement (80K)
- ☐ Administrative Warrant
- ☐ HIV Testing
- ☐ Arbitration Awards
- ☐ Appointment of Receiver
- ☐ Shareholders' Derivative Actions
- ☐ Foreign Deposition
- ☐ Pre-action Discovery
- ☐ Common Law Habeas Corpus
- ☐ Prisoner Transfers
- ☐ Foreign Judgments
- ☐ Minor Settlements
- ☐ Other Civil

### CHILD PROTECTIVE CUSTODY (PC)

- ☐ Non-DHS Protective Custody

### SPECIAL ACTIONS (SA)
**Money Judgment**
- ☐ Money Judgment Request Disclosure

### REAL ESTATE (RE)

**Title Actions**
- ☐ Quiet Title
- ☐ Eminent Domain
- ☐ Easements
- ☐ Boundaries

**Foreclosure**
- ☐ Foreclosure (ADR exempt)
- ☐ Foreclosure  (Diversion eligible)
- ☐ Foreclosure - Other

**Misc. Real Estate**
- ☐ Equitable Remedies
- ☐ Mechanics Lien
- ☐ Partition
- ☐ Adverse Possession
- ☐ Nuisance
- ☐ Abandoned Roads
- ☐ Trespass
- ☐ Other Real Estate

### APPEALS (AP) (To be filed in Superior Court)  (ADR exempt)

- ☐ Governmental Body (80B)
- ☐ Administrative Agency (80C)
- ☐ Other Appeals

---

**VI. M.R. Civ. P. 16B Alternative Dispute Resolution (ADR):**

**VI.**     ☐ I certify that pursuant to M.R. Civ. P. 16B(b), this case is exempt from a required ADR process because:

- ☐ It falls within an exemption listed above (i.e., an appeal or an action for non-payment of a note in a secured transaction).
- ☐ The plaintiff or defendant is incarcerated in a local, state or federal facility.
- ☐ The parties have participated in a statutory pre-litigation screening process with _____
- ☐ The parties have participated in a formal ADR process with _____ on
   _____(date).
- ☐ This is an action in which the plaintiff's likely damages will not exceed $50,000, and the plaintiff requests an exemption from ADR pursuant to M.R. Civ. P. 16C(g).

---

CV-001, Rev. 07/15                               Page 1 of 3

**VII. (a)** ☐ **PLAINTIFFS (Name & Address including county)**

or ☐ **Third-Party,** ☐ **Counterclaim or Cross-Claim Plaintiffs**

☐ The plaintiff is a prisoner in a local, state or federal facility.

Donna Webb
22 Franklin Street
Calais ME 04619
Washington County

**(b)** Attorneys (Name, Bar number, Firm name, Address, Telephone Number)   **If all counsel listed do NOT represent all plaintiffs, specify who the listed attorney(s) represent.**

Guy D. Loranger, Esq. Bar No. 9294
Law Office of Guy D. Loranger
1 Granny Smith Court Suite 3
Old Orchard Beach ME 04064

**VIII. (a)** ☐ **DEFENDANTS (Name & Address including county)**

and/or ☐ **Third-Party,** ☐ **Counterclaim or** ☐ **Cross-Claim Defendants**

☐ The defendant is a prisoner in a local, state or federal facility.

Calais Regional Hospital
24 Hospital Lane
Calais ME 04619
Washington County

**(b)** Attorneys (Name, Bar number, Firm name, Address, Telephone Number)   **If all counsel listed do NOT represent all defendants,**
(If known)   **specify who the listed attorney(s) represents.**

unknown

**IX. (a)** ☐ **PARTIES OF INTEREST  (Name & Address including county)**

(b) Attorneys (Name, Bar number, Firm name, Address, Telephone Number)   **If all counsel listed do NOT represent all parties,**
(If known)   **specify who the listed attorney(s) represents.**

**X.**      **RELATED CASE(S) IF ANY** _____

Assigned Judge/Justice _____   Docket Number _____

Date: January 22, 2020 _____

Guy D. Loranger
Name of Plaintiff or Lead Attorney of Record

_____
Signature of Plaintiff or Attorney